UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JAMES W. BOYD, et. al.,

        Appellants,

                                        CASE NO. 1:08-CV-617

v.

                                        HON. ROBERT J. JONKER

JOHN A. ENGMAN, et. al.,

        Appellees.

_____/

## OPINION

      Appellants James Boyd and Day & Sawdey, P.C., appeal from the bankruptcy court's May 14, 2008 order disallowing certain claimed fees and expenses. (*See* Notice of Appeal, docket # 1.) The Court heard oral argument on this appeal on October 31, 2008. (Docket # 17.)

## BACKGROUND

      Appellee John Engman ("Debtor") filed for Chapter 7 bankruptcy protection on December 28, 2001. *In re Engman*, 331 B.R. 277, 281 (Bankr. W.D. Mich. 2005) ("*Engman I*").[1] This proceeding has been lengthy and contentious. Appellant James Boyd is the current trustee of Debtor's bankruptcy estate. The previous trustee, Thomas Bruinsma, resigned in April 2006 after Debtor filed a Motion to Remove Trustee and His Counsel. (*See* Notice of Appeal, docket # 1, Record Item 19, at ¶¶ 9-10.) Appellant Day & Sawdey is the law firm that represented the former trustee in his capacity as trustee of Debtor's estate. Appellant Boyd has hired new counsel, but continues to employ Day & Sawdey in a limited capacity.

---

     [1] *Engman I* is a published opinion and is a part of the record on appeal. (Notice of Appeal, docket # 1, Record Item 18.) All citations to *Engman I* refer to the published opinion.

**I.  Debtor's Dispute with the Sun-Da-Go Condominium Association**

The Debtor is an attorney and operates a private law practice.  *Engman I*, 331 B.R. at 281.

Debtor also worked to develop a residential real estate project.  In the early 1990's Debtor and his

wife co-developed a condominium project known as "Sun-Da-Go."  *Id.*  The Sun-Da-Go project

consisted of eighteen plots of land along the Thornapple River in Kent County, Michigan.  Mr. and

Mrs. Engman sold nine of the eighteen lots in the Sun-Da-Go development.  *Id.*  They retained a

joint ownership interest in the nine undeveloped lots.  *See id.*

Mr. Engman filed for divorce in 1995.  (Appellate Brief of John Engman, docket # 13, at 2.)

The  Kent County Circuit Court appointed a receiver to manage the Sun-Da-Go development during

the pendency of the divorce proceedings.  *Id.* With the help of the court-appointed receiver, the nine

non-developer lot owners at Sun-Da-Go formed the Sun-Da-Go Condominium Association  ("the

Condo Association") in May 1997.  *Engman I*, 331 B.R. at 282.  The newly formed Condo

Association began assessing dues against Debtor and his ex-wife based on their joint ownership of

the nine unsold Sun-Da-Go lots.  *Id.*  Debtor steadfastly refused to pay the dues and the Condo

Association eventually filed a small claims action in Michigan state court to recover the balance.

*Id.*  The Condo Association twice obtained a small claims judgment against Debtor, but the state

circuit court twice reversed and remanded the judgment.  *Id.*  The Condo Association continued to

assess dues during the small claims action and Debtor's subsequent appeals.  *Id.*

The state court collection action still was pending at the time Debtor filed his petition for

Chapter 7 relief in December 2001.  *Id.*  At that point, Debtor's interest in the nine unsold lots

became part of the bankruptcy estate, and the Condo Association began assessing dues against

Debtor's estate.  *Id.*  The Condo Association also claimed that its internal bylaws and M.C.L.

§ 559.208 operated to create a lien in favor of the Condo Association and against the nine unsold

properties for unpaid assessments on the unsold lots.[2] *Id.* at 284. Debtor maintained that the Condo

Association had no authority to assess dues against him and that neither he nor the bankruptcy estate

owed any amount of money to the Condo Association. *Id.* at 284-85.

## II. The Trustee's Attempts to Resolve the Dispute with the Condo Association

In February 2004, former Trustee Bruinsma filed a motion under 11 U.S.C. § 363(b) seeking

authority to sell a number of the undeveloped Sun-Da-Go Lots. *Engman I*, 331 B.R. at 280.

Bruinsma also sought authority to use the proceeds from the proposed sales to pay the debts allegedly

due and owing to the Condo Association. *Id.* Debtor objected to the sale of the lots and any

distribution to the Condo Association. *Id.*

In March 2004, Bankruptcy Judge Hughes authorized Bruinsma to sell the undeveloped Sun-

Da-Go lots. *Id.* However, Judge Hughes denied without prejudice Bruinsma's request for court

authorization to distribute the sale proceeds to the Condo Association. *Id.* A few months later,

Trustee Bruinsma again sought court approval for the same sale and distribution. *Id.* Bruinsma

argued that he was unable to close the previously authorized sales because he could not use the sale

proceeds to pay real estate taxes, closing costs, and other administrative expenses associated with

sale of the property. (Notice of Appeal, docket # 1, Record Item 10.) Appellee Engman again

objected to any proposed distribution to Sun-Da-Go, and the bankruptcy court again refused to issue

the requested authorization. *Engman I*, 331 B.R. at 280. However, Judge Hughes did agree to hold

---

[2] M.C.L. § 559.208(1) states: "Sums assessed to a co-owner by the association of co-owners that are unpaid together with interest on such sums, collection and late charges, advances made by the association of co-owners for taxes or other liens to protect its lien, attorney fees, and fines in accordance with the condominium documents, constitute a lien upon the unit or units in the project owned by the co-owner at the time of the assessment."

a status conference to address the proposed distributions, and Debtor eventually agreed to allow payment of closing costs and related expenses. (Appellate Brief of Day & Sawdey, docket # 9, at 6). Sometime thereafter, Trustee Bruinsma sold eight of the nine undeveloped Sun-Da-Go lots. *See id.*

At an August 2004 status conference addressing Debtor's objections to the proposed distribution, Bankruptcy Judge Hughes determined that the trustee did not actually need court authority to pay the Condo Association. *Engman I*, 331 B.R. at 280-81. In Judge Hughes' view, a trustee has inherent authority to "settle" a claim against the estate without court approval and over the debtor's objections. *Id.* Judge Hughes informed the trustee that the bankruptcy court would resolve Debtor's objections by treating the trustee's request for court authorization as a motion for settlement approval under Fed. R. Bankr. P. 9019(a).[3] *Id.* Trustee Bruinsma initially opposed Judge Hughes' decision to construe the dispute as a Rule 9019(a) motion. (*See* Appellate Brief of Day & Sawdey, docket # 9, at 8.) Trustee Bruinsma thought the dispute between Debtor and the Condo Association should be treated as an objection-to-claim under Fed. R. Bankr. P. 3007, but Judge Hughes disagreed.[4] *Id.; see also Engman I*, 331 B.R. at 280-81. The trustee ultimately acquiesced

---

[3] Fed. R. Bankr. P. 9019(a) states: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct."

[4] Judge Hughes now appears to have concluded that neither he nor the trustee identified the proper procedural vehicle for disposing of Debtor's objections. In an opinion issued after this appeal was filed but before oral argument, Judge Hughes stated:

> I was wrong when I concluded years ago that the distributions from the proceeds that the former trustee was then proposing to make to the condominium association were discretionary in nature and that, as such, the court's review of the same could be made under the rubric of a Rule 9019(a) settlement approval . . . . Instead, the analysis should have been under [11 U.S.C. § 725], with the question being whether the court should authorize the former trustee under that section to distribute the

and began preparing a Rule 9019(a) motion for "trial." (*See* Appellate Brief of Day & Sawdey, docket # 9, at 8.)

### III. The Bankruptcy Court's Ruling on the Proposed Settlement

In May 2005, the bankruptcy court held a three and a half day "trial" addressing Debtor's objections to the proposed distribution. (Notice of Appeal, docket # 1, Record Items 6, 13-15; *Engman I*, 331 B.R. at 281.) Debtor and Trustee Bruinsma conducted discovery, drafted trial briefs, and called witnesses to testify at the hearing. *Engman I*, 331 B.R. at 281. The bankruptcy court spent fourteen hours hearing testimony and argument from the parties. *Id.* at 286. Day & Sawdey prepared and argued the motion for Trustee Bruinsma. *See id.*

Approximately four months after the May 2005 hearing, and over one year after the trustee initially moved for court approval, the bankruptcy court issued a forty-six page opinion and order denying Trustee Bruinsma's motion for Rule 9019(a) approval. *Id.* at 277. The court found that the settlement failed to satisfy the trustee's fiduciary duty of care to the bankruptcy estate. *Id.* at 305. In applying the fiduciary standard to Trustee Bruinsma's motion, Judge Hughes departed from established case law holding that a bankruptcy court should approve settlements under Rule 9019(a)

---

liened portion of the sale proceeds claimed by the condominium association as he was proposing notwithstanding Mr. Engman's objection.

(Opinion Supplementing Court's August 21, 2008 Scheduling Order, at 32-33 n. 29, *available at* http://www.miwb.uscourts.gov/content/opinions). Section 725 states, "After commencement of a case under this chapter, but before final distribution of the property of the estate under section 726 of this title, the trustee, after notice and a hearing, shall dispose of any property in which an entity other than the estate has an interest, such as a lien, and that has not been disposed of under another section of this title."

so long as those settlements are "fair and equitable."[5]  *See id.* at 286-89.  Nevertheless, Trustee Bruinsma did not appeal this ruling.

With the benefit of hindsight it is tempting to suggest that all parties and the Court would have been better served if Judge Hughes had followed the lead of every other court to consider the matter, including the Bankruptcy Appellate Panel in this Circuit, and evaluated the trustee's proposed resolution with the Condo Association using the flexible "fair and equitable" standard. The total amount of fee assessments in dispute was less than $83,000, or about $11,000 per unsold lot.  *See Engman I*, 331 B.R. at 284.  One wonders whether it was really necessary or prudent to insist on a unique and exacting fiduciary duty analysis requiring fourteen hours of court testimony and a forty-six page opinion to decide whether the trustee's proposed resolution made sense. Ironically, the process resulted in an order denying approval in September 2005, even though it appears the bankruptcy court just recently approved a similar distribution plan under 11 U.S.C. § 725.  (*See* Case No. 1:09-cv-151, docket # 1, Notice of Appeal, Record Item 6, December 19, 2008 Order approving a $60,000 settlement between Debtor's estate and the Sun-Da-Go Condo Association.)  A construction and application of Rule 9019(a) that contributed to adding over four

---

[5] The Sixth Circuit Bankruptcy Appellate Panel has expressly rejected Judge Hughes' use of the fiduciary duty standard in evaluating bankruptcy settlements.  *See In re Anderson*, 377 B.R. 865, 872-73 (6th Cir. BAP 2007).  Judge Hughes continues to apply his standard and asserts that BAP decisions are not binding on him beyond the case in which the mandate actually issues.  *See In re Novak*, 383 B.R. 660, 674 (Bankr. W.D. Mich. 2008).  Without resolving the merits of either the underlying dispute over the appropriate standard or the proper application of BAP decisions as precedent, the Court notes that the approach used by Judge Hughes on both issues has the almost certain effect of adding cost, uncertainty, and delay to the bankruptcy process.  This is rarely beneficial in any judicial proceeding, and certainly not in a bankruptcy proceeding that depends heavily on speed, predictability and cost-minimization to achieve its purposes.  *See* Fed. R. Bankr. P. 1001 ("These rules shall be construed and administered to secure the just, speedy, and inexpensive determination of every case and proceeding.").

years and significant costs to this Chapter 7 process, and that has been rejected by every other court

to consider it, hardly seems consistent with the mandate of Fed. R. Bankr. P. 1001. But these

questions and observations have the benefit of hindsight. Moreover, a ruling on the underlying legal

issue is not, in the Court's view, necessary to resolution of the cost and fee issues framed in this

appeal. Accordingly, the Court leaves the question for further consideration and application in the

bankruptcy court and any appeals to this Court that directly present the issue.

As of the date of this appeal, eight of the nine undeveloped lots have been sold, but no funds

have been disbursed to the Condo Association. (Appellate Brief of Day & Sawdey, docket # 9, at

8.) Because the lots were sold free and clear of any liens or encumbrances, the Condo Association

now claims a lien on the sale proceeds. *Id.* Both the current and former trustee assert that Mr.

Engman's ex-wife is entitled to one half of the sale proceeds pursuant to her status as joint owner

of the nine unsold lots.[6] Mr. Engman contends that neither his wife nor Sun-Da-Go is entitled to any

portion of the sale proceeds. (*See* Appellate Brief of John Engman, docket # 13.)

## IV. Day & Sawdey's Fee Applications

Appellant Day & Sawdey filed its first application for interim approval of fees in June 2003.

(*See* Notice of Appeal, docket # 1, Record Item 12.) Debtor and Appellee Ludwick objected to the

---

[6] The former Mrs. Engman died in June 2003. The Engmans' two daughters claim to have inherited Mrs. Engman's one-half interest in the Sun-Da-Go properties. *See Engman I*, 331 B.R. at 283 n. 17. Debtor counters that his daughters have no ownership interest in the Sun-Da-Go Properties. (Appellate Brief of John Engman, docket # 13, at 6.) According to Debtor, his former wife forfeited her interest in the properties prior to her death by executing a quitclaim deed in violation of the divorce court's anti-alienation order. *Id.* Debtor argues that he (or his estate) became the sole owner of the Sun-Da-Go properties as of the date of the alleged quitclaim deed. *Id.*

fee application.[7]  *Id.*  The bankruptcy court held a hearing addressing appellees' objections, and the court ultimately approved fees in the reduced amount of $47,797.50 on an interim basis and "without prejudice to any claim . . . that the Chapter 7 Trustee violated his fiduciary duties to the bankruptcy estate by authorizing any or all of the services rendered by Day & Sawdey."  *Id.*

Day & Sawdey filed its second fee application on August 15, 2007.  (Notice of Appeal, docket # 1, Record Items 25-29.)  The second fee application spans eighty-seven pages and covers the time period from July 22, 2003 to August 11, 2007.  *Id.*  The application is very detailed.  Each fee entry contains a full description of the service, the date on which the service was performed, and the rate charged.  *Id.*  The application includes time Day & Sawdey spent defending its first fee application and pursuing Rule 9019(a) settlement approval.  *Id.*  In total, Day & Sawdey claimed $113,060 in fees and $2,666.05 in expenses.  *Id.*

Appellees Engman and Ludwick again objected to any interim fee award for Day & Sawdey.  (Notice of Appeal, docket # 1, Record Items 30-31.)  Appellees' objections are too numerous too list individually, but the gravamen of their position is that Trustee Bruinsma mismanaged the estate and Day & Sawdey sought reimbursement for (a) non-legal services; or (b)  legal services that did not benefit the estate.  *See In re Engman*, 389 B.R. 36, 41 (Bankr. W.D. Mich. 2008) ("*Engman II*").[8]

---

[7]Appellee Karen Ludwick is a creditor of the Engman estate and therefore has standing to object to distributions from the estate.  *In re Engman*, 389 B.R. 36, 39 (Bankr. W.D. Mich. 2008).  Mr. Engman has standing as the debtor to object because the trustee expected this case to result in full satisfaction for creditors, and a residual distribution for the debtor.  *Id.* at 39-40. At the appeal hearing the current trustee stated he still expected this case to result in a one-hundred percent satisfaction for creditors, though ongoing objections by the debtor to virtually all decisions and proposed decisions of the trustee have the potential to exhaust any excess available in the estate.  If that happens, debtor may lose his standing to object.

[8]*Engman II* is a published opinion and is a part of the record on appeal.  (Notice of Appeal, docket # 1, Record Item 36.)  All citations to *Engman II* refer to the published opinion.

In his list of objections, Debtor accused Day & Sawdey of lying regarding the sale and value of the Sun-Da-Go properties, and he requested "full and complete discovery of all issues contained herein, including every single document or note for which debtor or his estate is being charged, or any correspondence between creditors of the estate and the Trustee's attorney." (Notice of Appeal, docket # 1, Record Item # 31.) Debtor also sought to depose the Day & Sawdey attorney responsible for billing the case. *Id.*

The bankruptcy court approved in part and denied in part Day & Sawdey's fee application. In total, the court disallowed $65,659.50 in fees and $209.66 in expenses. *Id.* at 52. The court disallowed the following amounts for the following reasons:

(1) $32,368.00 disallowed because the Bankruptcy Code does not allow attorneys to recover fees incurred in responding to objections to a Rule 9019(a) motion. *Id.* at 51.

(2) $7,849.00 disallowed because the Bankruptcy Code does not allow attorneys to recover fees incurred in responding to objections to a previous fee application. *Id.* at 48.

(3) $22,193.00 disallowed because the work was "nonlegal trustee work." *Id.* at 45.

(4) $3,249.50 disallowed because the work was "unnecessary and non-beneficial." *Id.* at 46.

(5) $209.66 in expenses disallowed because Day & Sawdey failed to substantiate the reasons behind the claimed expenses. *Id.* at 52.

Day & Sawdey and the current Trustee, James Boyd, appeal from this ruling. (Notice of Appeal, docket # 1.) This Court has jurisdiction over the appeal under 28 U.S.C. § 158(a).[9]

---

[9] 28 U.S.C. 158(a)(1) states: "The district courts of the United States shall have jurisdiction to hear appeals . . . from final judgment orders and decrees . . . and, with leave of the court, from other interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title."

**ANALYSIS**

## I.  Standard of Review

A district court acts as an appellate tribunal when it reviews a decision of the bankruptcy court.  *In re Caldwell*, 851 F.2d 852, 857 (6th Cir. 1988).  The court reviews factual findings under the clearly erroneous standard, and considers legal conclusions *de novo*.  *Id.*; Fed. R. Bankr. P. 8013. As a general rule, the court reviews the bankruptcy court's fee award for an abuse of discretion.  *In re Red Ball, Inc.*, 157 Fed. Appx. 850, 851 (6th Cir. 2005). The district court must uphold the bankruptcy court's award unless the bankruptcy court "fails to apply the proper legal standard or follow the proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous."  *In re Red Ball, Inc.*, 157 Fed. Appx. 850, 851 (6th Cir. 2005).  However, where a fee award is based on a legal construction of the Bankruptcy Code, the district court reviews the underlying construction *de novo*.  *See In re Big Rivers Elec. Corp.*, 355 F.3d 415, 428-29 (6th Cir. 2004); *Cf. In re Economy Lodging Sys, Inc.*, 234 B.R. 691 (6th Cir. BAP 1999).

## II.  General Legal Framework

11 U.S.C. § 330 governs the allowance of attorney's fees and expenses in bankruptcy actions. Section 330(a) instructs the bankruptcy court to award "reasonable compensation for actual, necessary services rendered" and "reimbursement for actual, necessary expenses."  The Sixth Circuit uses the "lodestar method" to determine what constitutes a reasonable fee award.  *In re Boddy*, 950 F.3d 334, 337 (6th Cir. 1991).  The lodestar method requires the court to determine a "lodestar amount" by calculating the attorney's reasonable hourly rate by the number of hours reasonably expended.  *Id.*; *see also In re Holder*, 207 B.R. 574, 581 (Bankr. M.D. Tenn. 1997).

Computing the lodestar amount requires two separate but related analyses. First, the court must determine what portion of the claimed attorney's fees correspond to "hours reasonably expended." *See Boddy*, 950 F.d at 337; *In re Arnold*, 162 B.R. 775, 777-78 (Bankr. E.D. Mich. 1993). "The number of factors potentially relevant to this determination probably borders on the infinite," *Arnold*, 162 B.R. at 778, but at a minimum the attorney's time must relate to a service that is reasonably likely to benefit the estate or necessary to the administration of the bankruptcy case. 11 U.S.C. § 330(a)(4); *Holder*, 207 B.R. at 583. Second, the court must ask whether the rate charged for the service is reasonable in light of the complexity and importance of the task. *Arnold*, 162 B.R. at 778. In evaluating the overall reasonableness of the fees, the bankruptcy court should consider the skill and experience of the attorney, the prevailing market rate for like services, the total time expended, the results obtained, and any other factor the court finds relevant. *See* 11 U.S.C. § 330(a)(3); *Holder*, 207 B.R. at 583; *Boddy*, 950 F.2d at 338.

### III. Issues on Appeal

The bankruptcy court analyzed Day & Sawdey's fee application line-by-line and determined that certain claimed fees were non-compensable. Without explicit reference to *Boddy* or the lodestar analysis, the bankruptcy court disallowed $65,659.50 in fees and $209.66 in expenses. *See Engman II*, 389 B.R. at 52. The bankruptcy court did not appear to take issue with Day & Sawdey's legal rates. *See Engman II*, 389 B.R. at 46 ("Attorney Ver Merris is a very capable attorney who has considerable experience representing bankruptcy estates. Consequently, $23.50 for six minutes of Attorney Ver Merris' time is certainly reasonable when the task at hand is to address a significant legal issue involving the bankruptcy estate."). The court's primary reason for disallowing the fees was that the underlying services were neither beneficial to the estate nor necessary to the

11

administration of the case.  *See Engman II*, 389 B.R. at 46, 48, 51.  Because the bankruptcy court disallowed different fees for different reasons, this Court will separately address each of the bankruptcy court's rulings.

### A. Is Time Spent Pursuing a Rule 9019(a) Motion Uncompensable as a Matter of Law?

The bankruptcy court held that Rule 9019(a) "does not . . . permit [the trustee] to recover from the bankruptcy estate the fees incurred by him in seeking the desired order [of approval] once it has become clear that his motion will be contested." *Engman II*, 389 B.R. at 51.  The bankruptcy court's ruling is premised on two legal constructions of the Bankruptcy Code.  This Court reviews that ruling *de novo*. *See In re Big Rivers Elec. Corp.*, 355 F.3d 415, 428-29 (6th Cir. 2004).

The bankruptcy court determined that Trustee Bruinsma had the inherent authority to distribute funds to Sun-Da-Go in satisfaction for the Condo Association's claimed lien against the estate. *Id.* at 49.  Appellants argue that Sixth Circuit precedent requires court approval before the trustee may settle a claim against the estate.  (Appellate Brief of Day & Sawdey, docket # 7, at 9-14.) The logical implication of this argument is that fees incurred in pursuing that approval are "necessary to the administration of the case" within the meaning of 11 U.S.C. § 330(a)(4)(A).  There are various statements from the Sixth Circuit's published and unpublished opinions that seem to indicate court approval is necessary before the trustee may settle a claim against the bankruptcy estate, but Judge Hughes argues that the statements are non-binding precedent for a variety of reasons.[10]  Ultimately,

---

[10] In *Reynolds v. Comm'r of Internal Revenue*, the Sixth Circuit stated: "In bankruptcy proceedings, as distinguished from ordinary civil cases, any compromise between the debtor and his creditors must be approved by the court as fair and equitable."  861 F.2d 469, 473 (6th Cir. 1988). Subsequent to *Reynolds*, the Sixth Circuit has stated: "As Rule 9019 makes clear, a trustee (or debtor-in-possession) may not enter into a compromise agreement . . . without the approval of the bankruptcy court." *In re Signet Industries, Inc.*, 165 F.3d 28, *3 (6th Cir. 1998) (table opinion).

the Court need not decide this issue today because even if the trustee has the unilateral authority to settle a claim, that does not automatically and as a matter of law disqualify all fee requests for time spent pursuing Rule 9019(a) motions.  To the contrary, pursuing court approval of a settlement under Rule 9019(a) would almost certainly benefit the estate when, as in this case, the trustee needs to sell real estate to third parties in the context of a contentious bankruptcy proceeding, in the wake of an unusually contentious divorce proceeding, and in the presence of an ongoing controversy between the Condo Association and its original developer.  Under these circumstances, court approval would seem, as a practical matter, essential to selling the property at anything close to market price, and to limiting the opportunity for post-sale litigation.

The bankruptcy court held that a trustee's attempt to obtain court approval for settlement over a debtor's continued objection could not, as a matter of law,  provide any benefit to the bankruptcy estate.  *Engman II*, 389 B.R. at 50.  In the bankruptcy's court's view, Rule 9019(a) provides for nothing more than a "comfort order" that allows the trustee to protect himself in future litigation arising out of his decision to settle a claim against the estate.  *Id.* at 50.  As Judge Hughes stated:

> Again, Rule 9019(a) approval is not mandatory.  Nothing, therefore, obligates the trustee to proceed further.  He always has the option of withdrawing the motion and proceeding without an order.  Therefore, if he does choose to continue with the contested Rule 9019(a) motion, it is because of the trustee's own desire to secure for himself the protection afforded by that rule.  The bankruptcy estate itself, on the other hand, gains nothing from the trustee's further pursuit of the desired relief."

*Id.* Judge Hughes expressly stated that the ultimate denial of the trustee's motion had "no bearing" on whether the fees incurred were compensable; win or lose, the motion could never benefit the bankruptcy estate.  *Id.* at 51 n. 21.

13

Assuming *arguendo* that Judge Hughes is right regarding the discretionary nature of a Rule 9019(a) motion, his construction of the purpose of that rule and the corresponding concept of "benefit to the estate" is far too narrow. Settlement benefits the bankruptcy system as a whole, and each individual estate drawing on the value of that system, by "allow[ing] the trustee and creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." *In re Fishell*, 47 F.3d 1168, *2 (6th Cir. 1995) (table opinion); *see also In re Trism, Inc.*, 282 B.R. 662, 668 (8th Cir. BAP 2002) ("A major purpose of compromise is to avoid the expenses, burdens, and uncertainty associated with litigation."). The bankruptcy court in this case recognized that "[t]he bankruptcy process benefits from trustees settling disputes," *Engman II*, 389 B.R. at 50, but the court then drew an artificial distinction between actions the trustee *must* undertake and actions the trustee *may* undertake. *Id.* at 50-51. The proper question is not whether a given task is "mandatory" or "discretionary." The proper question is whether the task was reasonably likely to benefit the estate. *See* 11 U.S.C. § 330(A)(3)-(4).

All sorts of "discretionary" actions may benefit the estate. Pursuing a Rule 9019(a) motion benefits the estate because the prospect of obtaining court approval increases the likelihood that the trustee actually will settle the claim, and, in this case, actually sell the property and generate cash. Court approval, in general, makes it more likely that third parties will wade into a thicket of controversy and buy distressed property. The approval of the court serves as a form of insurance that makes it less likely the transaction will be subject to attack, or even undoing, at a later date. Thus, there is a direct benefit to the estate in the form of an increased likelihood of sale at a reasonable price. Judge Hughes may be right that judicial approval provides for a form of "comfort order," but he is wrong to conclude that the "comfort order" provides no corresponding benefit to the bankruptcy

system or the debtor's estate, or that the trustee is the only party comforted.[11]   *See Engman II*, 389

B.R. at 50.  Settlement under court auspices benefits the bankruptcy system.  *Cf. In re Martin*, 91

F.3d 389, 393 (3d Cir. 1996) ("Compromises are favored in bankruptcy").  Whether analyzed under

Rule 9019(a), 11 U.S.C. § 725, or any other section of the Bankruptcy Code or Rules of Procedure,

estate attorneys must be compensated for their reasonable efforts toward that end.        T h e

current trustee's approach to settlement in this case illustrates the value and importance of judicial

approval.  In his appellate brief, Trustee Boyd asserts that he has entered a number of settlement

agreements where the express terms of the agreement require court approval before becoming

effective.  (Docket # 7, at 6.)  The Trustee's approach is entirely reasonable given that some courts,

including the Sixth Circuit, have held that a settlement agreement in a bankruptcy case does not

become binding until approved by the court.  *See In re Signet*, 165 F.3d at*2 (holding that an oral

settlement agreement was unenforceable because the bankruptcy court never approved it); *see also*

*Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346 (3rd Cir. 1999).   Under these

circumstances, settlement approval may be both beneficial to the estate and necessary to the

administration of the case.  *Cf.* 11 U.S.C. § 330(a)(4)(A).  Rule 9019(a) is one procedural mechanism

by which a trustee can obtain the desired approval.  The rule itself provides obvious benefit to the

bankruptcy system, and Appellants' motion under the rule was consistent with the rule's intended

---

[11] The "comfort" of the trustee and any professionals hired by the trustee is itself an important benefit to the bankruptcy system, and to each individual bankruptcy estate in the system.  The bankruptcy process requires a ready, willing and able cadre of professionals to make the system work.  Bankruptcy estates do not administer themselves.  Moreover, particularly in contentious cases like this one with intricate legal issues, the professionals need to be intellectually and emotionally strong, as well as relentlessly practical.  Fair fee awards will ultimately determine whether these people are available.  If adequate and fair compensation is disallowed by the courts, professionals of this caliber will find other work and the entire system and all the debtors who use it will suffer.

purpose.  Accordingly, the bankruptcy court erred in holding as a matter law that the Rule 9019(a) proceeding that the bankruptcy court itself mandated provided no benefit to the estate.

The bankruptcy court's concept of "benefit to the estate" is also unduly narrow considering the overall purpose of bankruptcy law.  The goal of the bankruptcy process is to "obtain[] a maximum equitable distribution for creditors and ensur[e] a fresh start for individual debtors." *BFP v. Trust Corp.*, 511 U.S. 531, 563 (1994).  Consistent with that goal, the concept of benefit to the estate is "not restricted to a dollar for dollar interpretation."  *In re Holder*, 207 B.R. 574, 584 (Bankr. M.D. Tenn. 1997).  As the Bankruptcy Court for the Northern District of Illinois has stated:

> [T]he bankruptcy estate does not exist merely for esoteric purposes, but rather, serves as a fund from which allowed claims are to be paid in the order and priority established under the Bankruptcy Code.  Thus, other factors besides the economic impact on the estate of actions taken should be considered in the 'benefit to the estate' analysis . . . .

> One such nonexclusive factor to consider is whether the services rendered promoted the bankruptcy process or administration of the estate in accordance with the practice and procedures provided under the Bankruptcy Code and Rules for the orderly and prompt disposition of bankruptcy cases and related adversary proceedings.

*In re Spanjer Bros., Inc.*, 203 B.R. 85, 90 (Bankr. N.D. Ill. 1996).  Rule 9019(a) is one of many procedural rules designed to further the bankruptcy process.  Forcing the trustee or his attorneys to absorb the costs of a Rule 9019(a) motion effectively nullifies the utility of the rule.  Neither the trustee nor his attorneys will pursue a motion for settlement approval if they know they will not be compensated for their work.  The concept of "benefit to the estate" should not be read to eviscerate a rule of bankruptcy procedure.  Day & Sawdey's good faith effort to pursue Rule 9019(a) approval is compensable to the extent that the hours expended and rate charged are reasonable.  *See In re Boddy*, 950 F.2d 334, 337 (6th Cir. 1991).

The benefit to the estate is particularly strong where, as here, the trustee has been bombarded with objections throughout a highly contentious bankruptcy proceeding.  As Judge Hughes noted in his fee opinion, "Mr. Engman has objected to every motion by the trustee to liquidate the remaining Sun-Da-Go lots and every attempt by the trustee to resolve the ongoing disputes with his daughters and the condominium association."  *Engman II*, 389 B.R. at 39.  Given these circumstances, the trustee's decision to obtain pre-settlement judicial approval is entirely consistent with his duty to "collect and reduce to money the property of the estate . . . and close such estate as expeditiously as is compatible with the best interests of the parties in interest."  *See* 11 U.S.C. § 704(a)(1).  In fact, even Judge Hughes now seems to suggest that the trustee's actions are compensable.  (*See* Opinion Supplementing Court's August 21, 2008 Scheduling Order, at 32-33 n. 29, *available at* http://www.miwb.uscourts.gov/content/opinions) ("The former trustee clearly had to incur the fees he did in overcoming Mr. Engman's objection in order for him to proceed with the accounting to the condominium association that Section 725 required as part of the estate's administration."))  Although Judge Hughes' suggestion rests on application of a different section of the Bankruptcy Code, it elevates form over substance to disallow compensation under one rule and allow it under another when the underlying purpose of the action is exactly the same: namely, to obtain court approval of a proposed settlement.  The injustice of such a result is striking in this case, given that Judge Hughes effectively required the parties to use the Rule 9019(a) motion in the first place, if they wanted to obtain court approval.

This Court is mindful that 11 U.S.C. § 330 was intended to "eliminate abuses and detrimental practices attributable to attorney control of bankruptcy cases."  *In re Engel*, 124 F.3d 567, 572 (3d Cir. 1997) (internal quotations and footnotes omitted).  While the Court can imagine a circumstance

where a trustee and his attorneys conspire to run up exorbitant fees against the estate by spending an unreasonable amount of time pursuing a frivolous Rule 9019(a) motion, such is not the case here. There is simply no evidence that Trustee Bruinsma or Day & Sawdey abused the bankruptcy process. This has been a long and extremely contentious case. Appellants have spent a considerable amount of time attempting to resolve the many outstanding claims and overcome Debtor's persistent objections. In total, Appellants have recovered approximately $903,000 for Debtor's estate. *Engman II*, 389 B.R. at 43. Because the estate is potentially solvent, some of that money may one day be returned to Debtor. *Id.* at 49. With this background in mind, the bankruptcy court should have followed the Sixth Circuit's directive in *Boddy* and applied the lodestar analysis to determine a reasonable fee award for Day & Sawdey. There is nothing in the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, Sixth Circuit case law, or the unique facts of this case that prevents Day & Sawdey from recovering reasonable fees for time reasonably spent on the Rule 9019(a) motion.[12] The bankruptcy court's underlying construction of the Bankruptcy Code and the Bankruptcy Rules was incorrect as a matter of law. Because the record discloses no other reason for denying the fees, the court's ruling is reversed. Day & Sawdey is entitled to all fees incurred in pursuing Rule 9019(a) approval, as detailed in its Second Fee Application. (*See* Notice of Appeal, docket # 1, Record Items 36-39.)

---

[12] This Court agrees with Bankruptcy Judges Hughes' point that the ultimate disposition of the trustee's Rule 9019(a) motion is not dispositive of whether Day & Sawdey's fees are compensable. *See Engman II*, 389 B.R. at 51 n. 21. Benefit to the estate is measured at the time the service was rendered, not at the time the fee application is filed. *See In re Red Ball, Inc.*, 157 Fed. Appx. 850, 852 (6th Cir. 2005) (noting that "it is not fair to judge the necessity of [the attorneys'] services with the benefit of hindsight").

**B.  Is Time Spent Defending a Fee Application Uncompensable as a Matter of Law?**

Day & Sawdey spent 33.4 hours defending against objections to its first fee application. *Engman II*, 389 B.R. at 46.  The bankruptcy court refused to award Day & Sawdey any fees at any rate for that time because the court was "not satisfied that there is sufficient authority under Section 330(a) to warrant such fees."  *Id.* at 48.  Because this ruling involves a legal construction of the Bankruptcy Code, this Court reviews that ruling *de novo*.

The Bankruptcy Code expressly states that attorneys may recover fees for the "preparation of a fee application." 11 U.S.C. § 330(a)(6). The Code does not directly address whether attorneys may also be compensated for fees incurred in responding to objections to a fee application.  *See id.*; *In re St. Rita's Assocs. Private Placement, L.P.*, 260 B.R. 650, 652 (W.D.N.Y. 2001) (noting that "[t]he litigation of a fee dispute is an exercise to be distinguished from preparation of the underlying fee application").  The few courts to address this question have produced divergent results.  *Compare In re Worldwide Direct, Inc.*, 334 B.R. 108, 112 (D.C. Del. 2005) (allowing fees), *with St. Rita's Associates*, 260 B.R. at 652 (denying fees), *and In re Teraforce Technology Corp.*, 347 B.R. 838, 867 (Bankr. N.D. Tex. 2006) (allowing fees where the attorney is successful in defending against objections to the fee application).

Although the Sixth Circuit has not addressed this issue in a bankruptcy context, the court has held that other federal fee shifting statutes allow attorneys to recover fees for time spent "preparing and successfully litigating the attorney fee case."  *See*, *e.g.*, *Coulter v. State of Tennessee*, 805 F.2d 146, 151 (6th Cir. 1986) (limiting such fees to three to five percent of the hours allowed in the underlying case).  The *Coulter* Court noted that, "In adopting some 131 attorney fee shifting statutes . . . Congress intended to provide an economic incentive for the legal profession to try meritorious

19

cases defining and enforcing statutory policies and constitutional rights in a variety of fields of legal practice." *Id.* at 148. In an appendix to its opinion, the court listed all federal fee statutes in existence at the time, including the Bankruptcy Reform Act, 11 U.S.C. § § 303(1), 330(a), 363(n), 503(b). *Id.* at 152. This Court is aware of no superseding Sixth Circuit authority rejecting the application of *Coulter* in a bankruptcy context. *But see In re The Vogue*, 92 B.R. 717, 721, 725-27 (Bankr. E.D. Mich. 1988) (finding that *Coulter* "is dictum as far as bankruptcy law is concerned" and disallowing fees incurred defending against objections to a prior fee application).

Despite *Coulter*, the bankruptcy court in this case held that 11 U.S.C. § 330(a) did not allow Day & Sawdey to recover fees incurred in responding to objections to its first fee application. *Engman II*, 389 B.R. at 48. The bankruptcy court reasoned that Day & Sawdey's efforts provided no benefit to the estate and that there was no other statutory basis to allow such fees. *Id.* Additionally, the court referenced the so-called "American Rule," which requires litigants to bear their own legal expenses in the absence of a contrary agreement. *Engman II*, 389 B.R at 47-48.

The bankruptcy court erred in its construction of 11 U.S.C. § 330(a). Although *Coulter* may be dictum as applied to bankruptcy, that decision provides strong support for the notion that bankruptcy attorneys should not be forced to bear the costs of defending a fee application against objections. *See In re Big Rivers Elec. Corp.*, 252 B.R. 670, 675-76 (W.D. Ky. 2000) (citing *Coulter*, 805 F.2d at 151). To hold otherwise would allow a litigious objecting party to negotiate unwarranted reductions in a fee award simply because the attorney is faced with a no win situation: even if the attorney fights the objection and prevails, the time and resources spent on the issue often will outweigh the value of the amount in dispute. *See id.*; *Worldwide Direct*, 334 B.R. at 111. Such a scenario would undoubtedly compromise a bankruptcy attorney's ability to represent the estate, and

might also deter competent attorneys from specializing in bankruptcy law.  *See Worldwide Direct*, 334 B.R. at 111.  This is precisely the problem that Section 330(a) was designed to combat.  *See* H.R. No. 95-595, 95th Cong., 1st Sess. 330 (1977) (noting that Section 330(a) was enacted to prevent "bankruptcy specalists, who enable the system to operate smoothly, efficiently and expeditiously, [from being] driven elsewhere").  Therefore, the underlying purpose of Section 330(a) and other federal statutes allowing for attorney fees show that this time is necessary and beneficial to the bankruptcy system as a whole, and indirectly, to each estate participating in the system.  Again, there is nothing in Section 330(a) that limits the concept of "benefit to the estate" to a dollar for dollar calculation.  *See In re Holder*, 207 B.R. 574, 584 (Bankr. M.D. Tenn. 1997); *accord In re Veltri Metal Prods., Inc.*, 189 Fed. Appx. 385, 389 (6th Cir. 2006). Preparing and defending attorney fee applications is part and parcel with the attorney's role in the administration of the bankruptcy process and is therefore compensable under 11 U.S.C. § 330(a). Because the record discloses no other reason for disallowing the claimed fees, the court's decision is reversed.  Day & Sawdey is entitled to $7,849.00 for time reasonably spent defending its first fee application.

### C. Did Day & Sawdey Charge Legal Rates for Non-Legal Services?

The bankruptcy court disallowed $22,193.00 because the fees related to "nonlegal trustee work."  *Engman II*, 389 B.R. at 45.  The bankruptcy court analyzed Day & Sawdey's second fee application line-by-line and concluded that hundreds of the itemized entries involved tasks that did not require legal expertise.  *Id.* at 44-45.  In disallowing the claimed fees, the court relied on this District's Local Bankruptcy Rule 9013-1(i), which states:

> Rates charged must be commensurate with the level of skill required for a particular task;

> for example, attorney rates or paralegal rates may not be charged for nonlegal work, such as copying or delivering documents, preparing or filing proofs of service, or for trustee duties generally performed without the assistance of an attorney. When paralegals are utilized to perform legal services for an estate, they may be compensated as paraprofessionals rather than treated as an overhead expense.

*Id.* at 43. Because the bankruptcy court's ruling is premised on a legal construction of the Bankruptcy Code and this District's local rule, this Court reviews that ruling *de novo*.

There is nothing in the Bankruptcy Code that limits an attorney's right to recover for tasks or services that do not require "legal expertise." Attorneys are hired for their legal knowledge and skill, but not every task an attorney performs in the course of his or her day-to-day job requires a juris doctor degree. For example, an attorney has an ethical duty to communicate actively with his or her client and remain current on all aspects of the case. *See* Mich. Rules of Prof'l Conduct 1.4. This duty often will require the attorney to spend time discussing or reviewing issues that do not directly or immediately implicate an important legal issue. But to hold that the attorney must absorb the costs of time spent on these matters is to take an unrealistically narrow view of the attorney's responsibilities to the client. So long as the attorney's services are consistent with his or her professional duties to the client, the attorney is entitled to be compensated for those services at his or her normal billing rate.

Local Bankruptcy Rule 9013-1(i) should not be read to alter the structure of the attorney-client relationship or limit the fees that a bankruptcy attorney would otherwise be entitled to receive. *Cf. In re Boddy*, 950 F.2d 334, 337 (6th Cir. 1991) ("Congress intended no distinction between attorney's fees in bankruptcy cases and those awarded in non-bankruptcy cases."); *accord In re Worldwide Direct, Inc.*, 334 B.R. 108, 111 (D.C. Del. 2005). The rule prohibits an attorney from charging legal rates for "trustee duties generally performed without the assistance of an attorney,"

22

but it does not eliminate the attorney's duty to provide a full range of services to the client.[13]   The

bankruptcy attorney still must communicate with the client (the trustee) on both legal and nonlegal

matters and stay reasonably informed about all aspects of the overall case.  Indeed, in this case Day

& Sawdey was appointed to "afford legal counsel and representation" to the trustee on "any and all

matters relating to the estate in connection with which [the trustee] believes he requires the services

of an attorney." (Notice of Appeal, docket # 1, Record Items 7, 9.)  To the extent that Day &

Sawdey's services are consistent with the scope of the bankruptcy court's appointment and the

general professional obligations inherent to the attorney-client relationship, Local Rule 9013-1(i)

poses no bar to recovery.

In this case, there is no evidence that any of the claimed fees are inconsistent with Day &

Sawdey's role as representative for the trustees of Debtor's estate.  The bankruptcy court identified

literally hundreds of entries "where it appears that the trustee himself could have performed the

described task."  *Engman II*, 389 B.R. at 44.  This is the wrong question.  The issue is not whether

the trustee could, in the abstract, have performed a given task, but rather whether it was wrong as

---

[13] Local Rule 9013-1(i) appears to address for independent professionals the same concerns addressed by 11 U.S.C. § 328(b) for an individual trustee who also functions as a professional in the same case.  Section 328(b) states:  "If the court has authorized a trustee to serve as an attorney or accountant under section 327(d) of this title, the court may allow compensation for the trustee's services as such attorney or accountant only to the extent that the trustee performed services as attorney or accountant for the estate and not for the performance of any of the trustee's duties that are generally performed by a trustee without the assistance of an attorney or accountant for the estate."  The issue ultimately has less to do with rate, than with applying a boundary between "trustee work" and "professional work."  The boundary is not a bright line because some tasks may be appropriate for either the trustee or the outside professional, depending on the circumstances of a case.  In general, the more complex and contentious the case, the more likely it will be that the estate benefits from having such overlapping tasks performed by a professional.  Moreover, in any case warranting both a trustee and outside professionals, there will need to be communication and coordination.  Nothing in the Bankruptcy Code or Rules of Procedure preclude an award of compensation to the outside professionals for such necessary and beneficial tasks.

a matter of law for the trustee to assign the task to an outside professional, given the overall circumstances of the case.  Here, there is nothing in the record to suggest that the work at issue actually assigned by the trustee and performed by the attorneys was a legally inappropriate division of labor.

For example, the bankruptcy court disallowed a substantial amount of fees associated with disposition of the Sun-Da-Go properties because the Day & Sawdey attorney "did not limit his services to only legal matters associated with the disposition of the lots." *Engman II*, 389 B.R. at 45.  The disallowed entries consist primarily of telephone conversations with various parties regarding disposition of the Sun-Da-Go properties, correspondence with potential purchasers of the property, and examination and review of documents relating to the liens claimed against the property.  (*See* Notice of Appeal, docket # 1, Record Items 25-29.)  All of these tasks are part and parcel with the attorney's responsibility to the trustee.  As Trustee Bruinsma's Application for Appointment of Attorneys made clear, there were a number of complex legal issues intertwined with the Sun-Da-Go properties.  (*See id.*, Record Item 7.)  The trustee's desire to have Day & Sawdey spend time overseeing or coordinating certain aspects of the land sale is entirely reasonable given the highly contentious nature of this bankruptcy proceeding and the rate at which Debtor has objected to the trustee's actions.  Moreover, there is no evidence indicating that the trustee shirked his responsibilities to the estate or sat idle while Day & Sawdey performed all the typical "trustee duties."  In fact, many of the disallowed entries in this case correspond to communications between Day & Sawdey attorneys and the trustee.  Day & Sawdey's involvement is exactly what the Court would expect out of diligent attorneys and a cautious trustee.  There is simply no basis for holding that either the Bankruptcy Code or Local Rule 9013-1(i) bar recovery because some Day & Sawdey

services did not directly call for the exercise of legal expertise.  Because the record discloses no other reason for disallowing these fees,  Day & Sawdey is entitled to the full $22,193.00 claimed in its second fee application.

### D. Did Day & Sawdey Charge for Tasks that Did Not Benefit the Estate?

The bankruptcy court disallowed $3,249.50 because "the benefit or necessity of the service rendered is questionable." *Engman II*, 389 B.R. at 45-46.  The disallowed entries span a variety of topics, but most relate to what the bankruptcy court deemed "nothing more than a cursory review of seemingly inconsequential documents." *Id.* at 46.  The bankruptcy court specifically identified entries relating to Day & Sawdey's review of (1) documents filed during the brief period when Debtor's case was being administered as a Chapter 13 proceeding; (2) documents related to the United States Trustee's efforts to deny Debtor's discharge; and (3) documents filed during or shortly after Trustee Boyd succeeded Trustee Bruinsma.  *Id.*  The bankruptcy court's ruling that these services provided no benefit to the estate relies on a legal construction of the Bankruptcy Code's concept of "benefit to the estate" in 11 U.S.C. § 330(a).  Accordingly, this Court reviews the ruling *de novo*.

The bankruptcy court disallowed fees incurred by Day & Sawdey in reviewing various "inconsequential" documents.  From the face of the fee application, it is clear that the documents related to the bankruptcy case.   (*See* Notice of Appeal, docket # 1, Record Items 25-29.)  As discussed above, an attorney has an ethical obligation to stay reasonably informed about all material aspects of the case.  In the course of discharging this duty, the attorney inevitably will read hundreds of documents that are later determined to be inconsequential.  But reading these documents to determine whether they are relevant is just as important as laboring over a document of pivotal

significance. Both tasks are part of the lawyer's duty to the client, and both are compensable so long as the time spent and rate charged is reasonable. The concept of "benefit to the estate" must be measured "at the time [the services] were rendered, not at the time the court reviews the application." *In re Williams*, 378 B.R. 811, 823 (Bankr. E.D. Mich. 2007). An attorney cannot know that a document is "inconsequential" before reading that document. So long as the document is facially related to the bankruptcy case, a brief review is "beneficial" within the meaning of Section 330(a). *Id.* The bankruptcy court's recognition that Day & Sawdey's review of the inconsequential documents was "cursory" only supports the point that the fees charged were reasonable. Like all good attorneys, Day & Sawdey attorneys are able to determine quickly whether a task or document is worth a more in-depth review. Indeed, the vast majority of the disallowed fees correspond to time entries of less than one-third of an hour. (*See* Notice of Appeal, docket # 1, Record Items 25-29.) The bankruptcy court erred by construing Section 330(a) to disallow fees for quick review of documents that were facially related to the subject matter of the bankruptcy case, but that turned out to be inconsequential after review.

The other entries disallowed by the bankruptcy court on this ground are similarly infected with a legally inappropriate hindsight application of the "benefit to the estate" standard. Specifically, the bankruptcy court disallowed as non-beneficial Day & Sawdey fees for time spent addressing whether Debtor or Ms. Ludwick had defamed Trustee Bruinsma or Day & Sawdey, the trustee's agent in this case. *Engman II*, 389 B.R. at 46. In total, Day & Sawdey attorneys spent three hours conducting legal research on defamation law and one hour drafting a memorandum on the subject. (Notice of Appeal, docket # 1, Record Item 37.) Given the extremely contentious nature of this bankruptcy proceeding, a few hours of legal research on the validity of a potential defamation claim

is entirely consistent with Day & Sawdey's duty to represent the trustee in his administration of the estate. The claim, if viable, had potential financial benefit. Even if merely colorable, the claim had potential practical benefits in generating negotiating leverage.

The bankruptcy court erred by disallowing the claimed fees based on a legally erroneous hindsight application of the "benefit to the estate" test. The record discloses no other reason for disallowance, and accordingly, Day & Sawdey is entitled to the entire $3,249.50 disallowed by the bankruptcy court.

### E. Did Day & Sawdey Fail to Substantiate Certain Expenses?

The bankruptcy court disallowed $209.66 in expenses because Day & Sawdey did not explain the purpose for which the expense was incurred. *Engman II*, 389 B.R. at 52. The disallowed entries all relate to mileage and parking expenses. *Id.* Local Bankruptcy Rule 9013-1(n) states:

> An application for reimbursement of expenses shall list each expense, its date incurred/paid, and a description of the nature and purpose of the expense. For example, requests for mileage must include the date, destination, miles, per mile rate, and the reason for the trip.

The bankruptcy court found that the milage and parking entries lacked the specificity required by the Local Rules, but noted that the ruling was not final, and that Day & Sawdey "may include in its final application for fees another request for reimbursement of the disallowed mileage and parking provided that acceptable explanations are also offered at that time." *Id.*

Day & Sawdey has the "burden of providing for the court's perusal a particularized billing record." *See Building Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1402 (6th Cir. 1995). Day & Sawdey included in its fee application a general certification that all its fees and expenses were "necessary and proper to said estate, and further, that

27

the charges made for such services are reasonable and just." (Notice of Appeal, docket # 1, Record

Item 25). In addition, Day & Sawdey argues that "the purposes of those expenses are discernible

by reference to the descriptions of services rendered during the respective coverage dates of the bills

submitted in support of the fee application." (Appellate Brief of Day & Sawdey, docket # 9, at 21.)

The Court believes that this is one of those situations that calls for a dose of practicality. The

total amount of charges with potentially inadequate descriptions is $209.66, out of a total fee petition

of over $110,000. Proper application of Local Bankruptcy Rule 9013-1(n) requires a sense of

proportionality. Mileage or other travel charges involving thousands of dollars or airline tickets to

exotic destinations quite properly demand detailed explanations. Charges of a few dollars and cents

for mileage to a drop box do not need much beyond the attorney's certification that these practically

nominal expenses were properly incurred in pursuit of estate matters, along with the more than

$110,000 in other legitimate charges. On this record, once the attorney has certified the practically

nominal charges as necessary and reasonable in the context of a large and detailed fee petition, the

attorney has satisfied Local Rule 9013-1(n). Any objecting party must then come forward with some

specific reason to doubt the accuracy of the claimed expenses, just as a party opposing a well

supported Rule 56 motion must come forward with specific facts to put an issue in genuine dispute.

Fed. R. Civ. P. 56 ("When a motion for summary judgment is properly made and supported, an

opposing party may not rely merely on allegations or denials in its own pleading; rather, its response

must--by affidavits or as otherwise provided in this rule--set out *specific facts* showing a genuine

issue for trial.") (emphasis added). Because the record discloses nothing but a generic objection to

Day & Sawdey's certification of these nominal charges in the context of a detailed and sizeable fee

petition, the Court finds that no objection has created a genuine dispute about the claimed expenses, and Day & Sawdey is entitled to the $209.66 disallowed by the bankruptcy court.

## CONCLUSION

The bankruptcy court's order disallowing certain claimed fees and expenses in Day & Sawdey's second fee application (Notice of Appeal, docket # 1, Record Item 36) is reversed. Day & Sawdey is entitled to the entire amount of fees and expenses claimed in the fee application.

Dated:     March 4, 2009         /s/ Robert J. Jonker
                                ROBERT J. JONKER
                                UNITED STATES DISTRICT JUDGE

29